UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| HEATHER A. FENDER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )   CAUSE NO. 1:24-cv-00228-ALT |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, *sued as Frank Bisignano*,[1] | ) |
| *Commissioner of the Social Security* | ) |
| *Administration*, | ) |
| | ) |
|     Defendant. | ) |

**OPINION AND ORDER**

Plaintiff Heather A. Fender appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF 1). Fender filed her opening brief on December 18, 2024 (ECF 23), and the Commissioner filed a response brief on March 24, 2025 (ECF 29). Fender did not file a reply brief, and her time to do so has now passed. (ECF 27). For the following reasons, the Commissioner's decision will be AFFIRMED.

**I. FACTUAL AND PROCEDURAL HISTORY**

Fender applied for DIB and SSI in April 2021, alleging disability onset as of August 12, 2019. (ECF 9 at 37, 370-83).[2] Fender's claim was denied initially and upon reconsideration. (*Id.*

---

[1] Frank Bisignano became the Commissioner of Social Security in May 2025, and thus, pursuant to Federal Rule of Civil Procedure 25(d), he is automatically substituted for his predecessor as the defendant in this suit. *See La'Toya R. v. Bisignano*, No. 1:24-cv-01564-JMS-TAB, 2025 WL 1413807, at *n.2 (S.D. Ind. May 15, 2025).

[2] The administrative record ("AR") is comprised of 1,473 pages, with pages 1 to 594 filed at ECF 9, pages 595 to 1194 filed at ECF 10, and pages 1195 to 1473 filed at ECF 11. The AR page numbers cited herein correspond to the

at 269, 274, 289, 294). On April 18, 2023, administrative law judge ("ALJ") William Pierson conducted an administrative hearing (*id.* at 70-116), and on July 12, 2023, rendered an unfavorable decision to Fender, concluding that she was not disabled because she could perform her past relevant work as a glue/press ribbons production assembler, as well as a significant number of other unskilled, sedentary-exertional jobs in the national economy, despite the limitations caused by her impairments (*id.* at 37-62). The Appeals Council denied Fender's request for review (*id.* at 7-13), and the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

On June 3, 2024, Fender filed a complaint in this Court appealing the Commissioner's final decision. (ECF 1). Fender advances three arguments in her opening brief: (1) that the ALJ erred by drawing inferences about the severity of Fender's symptoms based on her failure to seek regular treatment without first considering her reasons for failing to seek treatment; (2) that the residual functional capacity ("RFC") assigned by the ALJ, and the corresponding hypotheticals to the vocational expert ("VE"), fail to account for Fender's "core conditions"; and (3) that the ALJ's step-four finding is unsupported and the ALJ failed to carry the Commissioner's burden at step five. (ECF 23 at 12-24).

On the date of the Commissioner's final decision, Fender was thirty-four years old (ECF 9 at 411); had a high school education with some special education (*id.* at 416); and had past relevant work as a glue/press ribbons production assembler, as well as past work experience as a cook, cashier, finisher in a recreational vehicle factory, and an "unracker" in a boat factory (*id.* at 60, 112, 437, 527). In her application, Fender alleged that she is disabled because she is

---

ECF-generated page numbers displayed at the top center of the screen when the AR is open in ECF, rather than the page numbers printed in the lower right corner of each AR page.

"medically fragile" and has a seizure disorder, anxiety, and depression. (*Id.* at 415; *see also* ECF 23 at 6-9).

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed "only if [it is] not supported by substantial evidence or if the Commissioner applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Id.* (collecting cases). "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## III. ANALYSIS

*A. The Law*

Under the Act, a claimant seeking DIB or SSI must establish that she is "unable to engage

3

in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also id.* §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring the ALJ to consider sequentially whether:

> (1) the claimant is presently employed [in substantial gainful activity]; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's [RFC] leaves [her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Pufahl v. Bisignano*, 142 F.4th 446, 452-53 (7th Cir. 2025) (citation omitted); *see also Sevec v. Kijakazi*, 59 F.4th 293, 298 (7th Cir. 2023); 20 C.F.R. §§ 404.1520, 416.920. "Between the third and fourth steps, the ALJ determines the claimant's [RFC], which is the claimant's maximum work capability." *Pufahl*, 142 F.4th at 453 (citations omitted); *see also* 20 C.F.R. §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). "The burden of proof is on the claimant for the first four steps." *Fetting v. Kijakazi*, 62 F.4th 332, 336 (7th Cir. 2023) (citation omitted). "At step five, the burden shifts to the [Commissioner] to show that there are significant numbers of jobs in the national economy for someone with the claimant's abilities and limitations." *Id.* (citation and internal quotation marks omitted). "If at any step a finding of disability or nondisability can be made, the Social Security Administration will not review the claim further." *Sevec*, 59 F.4th at 298 (citation and brackets omitted).

4

*B. The Commissioner's Final Decision*

In the Commissioner's final decision, the ALJ found as a threshold matter that Fender is insured for DIB through September 30, 2026. (ECF 9 at 39). At step one of the five-step sequential analysis, the ALJ found that Fender had not engaged in substantial gainful activity after her alleged onset date of August 12, 2019. (*Id.* at 40). At step two, the ALJ found that Fender had the following severe impairments: specific learning disability in reading, math, and written language; acute stress disorder; generalized anxiety disorder; post-traumatic stress disorder (PTSD); bipolar disorder; parietal lobe lesion with scattered T2 hyperintense foci in the frontal parietal white matter; psycho-neurogenic non-epileptic seizures (PNES); conversion disorder with seizures and/or convulsions; left hip trochanteric bursitis; femoroacetabular impingement of the left hip; and tear of the left acetabular labrum. (*Id.*). At step three, the ALJ concluded that Fender did not have an impairment or combination of impairments severe enough to meet or equal a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ assigned Fender the following RFC:

> [T]he claimant has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant is limited to lifting, carrying, pushing ten pounds frequently and occasionally; the claimant can sit at least six hours in an eight hour workday; can stand and/or walk two hours in an eight hour workday; the claimant should not climb ropes, ladders, or scaffolds; the claimant can occasionally kneel, crouch, and crawl; the claimant can occasionally bend and stoop in addition to what is required to sit; the claimant can occasionally use ramps and stairs; the claimant should not work upon uneven surfaces; the claimant should avoid working upon wet and slippery surfaces; the claimant can perform the balance of such activities; the claimant should avoid work within close proximity to open and exposed heights, in addition to open and dangerous machinery such as open flames and fast moving exposed blades; the claimant should avoid work involving concentrated exposure to vibration such as using heavy sanders; the claimant is limited from concentrated exposure to excessive fumes, chemicals, and gases; the claimant is limited from excessive heat, humidity, and cold such as when working outside or within a sawmill, boiler room, chemical plant, green house, refrigerator unit, or sewage plant; the claimant should not drive motor vehicles including fork lifts; the claimant should not drive motor vehicles including fork

> lifts; the claimant should not work within close proximity to very loud noises (level 5) such as a fire alarm or very bright flashing lights such as a strobe more than occasionally; the claimant can have brief interaction with the public; work should not involve prolonged and intensive interaction/interpersonal contact with coworkers and supervisors in order to complete work product; other contact with supervisors and co-workers will be brief and frequent; job instructions may be received from supervisors; the claimant can perform simple, routine tasks and instructions throughout the workday; the claimant can learn tasks through short demonstration or, if not, within up to a period of 30 days; work place changes should be gradual and expected; the claimant can respond or adapt to changes, cope with stress and engage in the decision making required of such tasks; with such limitations in place, the claimant can maintain the concentration, persistence, adaptation and even the pace required of such tasks for two hour increments, and for eight hour workdays within the confines of normal work place breaks and lunches on a sustained day to day basis.

(*Id.* at 45 (bold font omitted)).

The ALJ determined at step four that given the foregoing RFC, Fender could perform her past relevant work as a glue/press ribbons production assembler as it was actually performed (sedentary). (*Id.* at 59). Additionally, the ALJ found that given Fender's age, education, experience, and RFC, Fender could perform a significant number of unskilled, sedentary jobs in the national economy, including addresser, tube operator, and polisher. (*Id.* at 61). Accordingly, Fender's applications for DIB and SSI were denied. (*Id.* at 62).

## C. Failure to Seek Treatment

Fender first argues that the ALJ unfairly focused on her failure to comply with treatment when assessing the severity of her impairments. (ECF 23 at 12-13). She emphasizes that "[f]ailure to comply with treatment may be a sign of mental disability rather than a reason to discount its severity." (*Id.* at 13 (quoting *Frierson v. Colvin*, No. 2:14-cv-170, 2015 WL 5174058 (N.D. Ind. Sept. 2, 2015)); *see also Seamon v. Barnhart*, No. 05-C-13-C, 2005 WL 1801406, at *19-20 (W.D. Wis. July 29, 2005) ("[I]t is questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation[.]" (citation omitted)).

6

The ALJ observed throughout his decision that the record lacked evidence to support Fender's allegations of ongoing medical treatment. (*See* ECF 9 at 43 ("The claimant alleged ongoing mental health treatment and possible memory therapies/treatment. However, despite such allegations and keeping the record open, neither neurology nor Bowen Center records were received."); *id.* at 44 ("[A]lthough the claimant returned with complaints in May 2021, there is little again for mental health treatment documented as sought and received since November 2021 for any issues such as conversion disorder, pseudoseizures, depression, anxiety, [PTSD], bipolar disorder, etc."); *id.* at 51 ("Although the claimant reported that she was still being prescribed psychiatric medications from the Bowen Center at the psychological consultative examination on January 19, 2022, this visitation on November 15, 2021, is the last known visitation in the medical records."); *id.* at 53 ("[T]he claimant did not seek formal psychological treatment on a regular basis, nor did she ever require inpatient care for her mental health. In addition, there are only treatment records from the Otis Bowman Center from May 12, 2021, through November 15, 2021, which also substantiates the claimant's lack of formal psychological treatment."); *id.* at 57 ("[I]t was further indicated that she did not show up to any of her [physical therapy] follow-up appointments . . ."); *id.* at 58 ("[T]he claimant did not undergo physical therapy consistently and she appeared to no[t] require any medications to help manage her brain disorders."); *see also id.* at 48-49, 54).

Fender's point, as a general matter, is well taken. Here, however, the ALJ's observations about the treatment that Fender did, or did not, participate in are grounded in the record and part of the ALJ's assessment of the record as a whole. *See Prill v. Kijakazi*, 23 F.4th 738, 749 (7th Cir. 2022) ("An ALJ is entitled to consider the course of a claimant's treatment." (citation omitted)); *Elektra P.-S. v. O'Malley*, No. 22-cv-00726, 2024 WL 973762, at *12 (N.D. Ill. Feb. 27, 2024)

7

(noting that the ALJ "did not cite Claimant's 'sporadic' mental health treatment in isolation[,]" but "included this point as part of his broader assessment of Claimant's minimal mental health treatment despite numerous visits with physicians . . . ."). For example, the ALJ asked Fender at the hearing how often she participated in mental health treatment at the Bowen Center, and she responded "once a month[.]" (ECF 9 at 96-97). Upon further probing by the ALJ, Fender indicated she was going to mental health therapy "[l]ike once every two weeks." (*Id.* at 97). Later in the hearing, the ALJ asked Finder: "Have you been going [to the Bowen Center] on a regular basis since November of '21, or was there a break in treatment?" (*Id.* at 100). Fender responded: "There was a break in my therapy, but not with my psychiatrist." (*Id.*). The ALJ then inquired: "Why was there a break in the therapy?" (*Id.*). Fender responded: "Because I didn't feel like it was helpful." (*Id.*). Thus, the ALJ did ask Fender about the reasons for her infrequent mental health treatment.

      Also, the ALJ mentioned in his decision Fender's report to her treating provider in May 2021 that she was "afraid to go get [her health conditions] checked out due to the possibility of finding something." (*Id.* at 46; *see* ECF 10 at 371); s*ee Deborah M. v. Saul*, 994 F.3d 785, 790 (7th Cir. 2021) ("[C]ontrary to Plaintiff's argument, Social Security Rule 16-3p did not require the ALJ to ask Plaintiff about her failure to seek treatment. That rule provides that an ALJ must consider possible reasons for a failure to seek treatment." (citation omitted)). Thus, this is not a case in which the ALJ failed to ask the claimant why she did not seek mental health treatment or failed to consider any reasons for the lack of mental health treatment in the record. *Cf. Potysman v. Colvin*, 218 F. Supp. 3d 782, 788 (N.D. Ind. 2016) (remanding case where the claimant's lack of insurance and financial resources may have played a part in the claimant's failure to pursue treatment, and "the ALJ failed to ask [the claimant] why he did not seek mental health treatment,

8

and did not attempt to consider any reasons for the lack of mental health treatment in the decision").

Moreover, aside from her mental health concerns, Fender does not point to any specific reason in the record why she did not regularly participate in treatment for her conditions that the ALJ failed to consider. (*See* ECF 23 at 12-13); *see Tallar v. Kijakazi*, No. 21-CV-611-SCD, 2022 WL 4092149, at *8 (E.D. Wis. Aug. 30, 2022) (acknowledging that people with mental illness often fail to seek treatment, but rejecting the claimant's assertion that the ALJ improperly drew a negative inference from her lack of mental health treatment where "[the claimant] fails to point to any evidence in the record implying that her mental impairments prevented her from submitting to mental health treatment"). It was Fender's burden to produce records to support the severity of her alleged mental impairments. *See, e.g.*, *Thaddeus R. v. King*, No. 24 C 4395, 2025 WL 405040, at *4 (N.D. Ill. Feb. 5, 2025) (acknowledging the lack of mental health treatment in the record and stating that it was the claimant's burden to produce records supporting his alleged mental impairments). Given the record presented, the ALJ did not unfairly consider the treatment that Fender did, or did not, participate in during the relevant period. *See Elektra P.-S.*, 2024 WL 973762, at *12 ("Having considered and rejected Claimant's explanations, the ALJ permissibly relied on the sporadic nature of that treatment." (citations omitted)).

### D. RFC

Fender also argues that the ALJ failed to account for her "core conditions" in the assigned RFC, including her PNES; conversion disorder, otherwise known as functional neurological disorder ("FND"); pain, weakness, and fatigue; mental complaints, and learning deficits. (ECF 23 at 13-22). She also conclusorily suggests that the ALJ unfairly discounted the severity of her conditions due to their unresolved etiology. (*Id.*). Contrary to Fender's assertion, the RFC

assigned by the ALJ is supported by substantial evidence.

### 1. Applicable Law

The RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," meaning eight hours a day, for five days a week. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (bold emphasis omitted). That is, the "RFC does not represent the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* (footnote omitted); *see also Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004); 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence. *See* SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see also* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). When determining the RFC, the ALJ must consider all medically determinable impairments, mental and physical, even those that are non-severe. *See* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); *see also Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). "[T]he determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (citation omitted); *see also* 20 C.F.R. §§ 404.1545(e), 416.945(e).

### 2. Etiology of Conditions

Fender suggests as a threshold matter that the ALJ unfairly discounted the severity of her conditions because their "etiology" was not "totally resolved[.]" (ECF 23 at 14). As Fender's argument goes, "the fact that [her conditions] were at least confused iteratively with stroke

symptoms, [multiple sclerosis], and more[,] itself tends to make them exemplary of extreme conditions." (*Id.*). But in advancing this one-paragraph argument, Fender fails to identify any actual additional limitations that should have been included in the assigned RFC but were not. (*See* ECF 23 at 14). "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citations omitted); *see Dragan K. v Saul*, No. 19-cv-3283, 2020 WL 4015326, at *2 (N.D. Ill. July 16, 2020) ("[T]he Seventh Circuit has consistently reiterated that a disability claimant must establish specific limitations affecting his/her ability to work." (collecting cases)). "[T]he mere diagnosis of any impairment does not establish the severity of the impairment." *Philpott v. Colvin*, No. 1:13-cv-01708-MJS-DKL, 2014 WL 4244299, at *4 (N.D. Ind. Aug. 26, 2014) (citation and internal quotation marks omitted) (collecting cases)). "It is not for this Court to develop [Fender's] arguments or comb through the record to find support." *William W. v. Saul*, No. 2:19-cv-00128-DLP-JRS, 2020 WL 5493932, at *9 (S.D. Ind. Mar. 25, 2020) (collecting cases).

### 3. PNES and FND

Fender next contends that the ALJ failed to account for her PNES and FND in the assigned RFC. (ECF 23 at 14-15).[2] Fender's argument is this: "The ALJ does not appear to purport that the RFC actually accommodates Plaintiff's PNES, *et al.*, in actuality—only that Plaintiff's symptoms are not objectively documented enough, or else that treatment was

---

[2] PNES are attacks that resemble epilepsy-related seizures, but they happen due to psychologist distress, not abnormal electrical activity in the brain. *See* Cleveland Clinic, Psychogenic Nonepileptic Seizures (PNES), https://my.clevelandclinic.org/health/diseases/25417-psychogenic-nonepileptic-seizure-pnes (last visited Sept. 18, 2025).
  FND, otherwise known as a conversion disorder, is "a psychiatric illness in which symptoms and signs affecting voluntary motor or sensory function cannot be explained by a neurological or general medical condition. Psychological factors, such as conflicts or stress, are judged to be associated with the deficits. . . ." Shahid Ali, *et al.*, Innovations in Clinical Neuroscience, Conversion Disorder—Mind versus Body: A Review (May-June 2015) (footnotes omitted), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC4479361 (last visited Sept. 18, 2025).

11

insufficient." (*Id.* (citations omitted)). Fender views the ALJ's reasoning as flawed because FND is "constituted by the incongruence and the inconsistency of symptoms at the neurological evaluations, elicited through distractible maneuvers." (*Id.* at 15 (citation omitted)). "Symptoms of FND are not intentionally produced and can involve any part of the body. Symptoms may appear suddenly, increase with attention to them, and decrease when the person is distracted." (*Id.* (citation omitted)).

Again, however, Fender fails to identify what additional limitations the ALJ should have included in the RFC to account for Fender's PNES or FND. The ALJ considered Fender's PNES and FND to be severe impairments at step two and reviewed the treatment records for these conditions, including the exam findings, imaging reports, and symptom testimony. (*See* ECF 9 at 40, 46-59). The ALJ also thoroughly discussed the relevant medical source opinions of record and the associated assigned limitations therein. (*See id.* at 51-54, 58-59).

On that front, the ALJ penned nearly two full pages on the consultative psychological examination performed by Dan Boen, Ph.D., in January 2022. (*Id.* at 51-53; *see* ECF 11 at 73-80). The ALJ summarized the mental status examination findings documented by Dr. Boen, including that Fender had an anxious mood, nervous affect, and normal behavior; her thought form was concrete with limited ability to think abstractly and contained auditory and visual hallucinations and mild suicidal ideation; her consciousness was normal; her concentration, judgment, and insight were moderately below normal; her long-term memory was normal but her short-term memory was significantly below normal; and she had average intelligence and an average fund of information. (ECF 9 at 52; *see* ECF 11 at 79). The ALJ also considered that Dr. Boen issued the following medical source statement:

> Heather would not have trouble understanding what Heather was asked to do on a job. Heather would have trouble remembering what Heather was asked to do on a

> job. Heather would have difficulty being able to concentrate on the job. Heather would have difficulty being able to stay on task. Heather would have difficulty being able to get along with coworkers. Heather would not have difficulty being able to get along with a boss.

(ECF 11 at 80).

Ultimately, the ALJ found Dr. Boen's opinion "somewhat persuasive[,]" reasoning as follows:

> The opinion . . . is somewhat persuasive as it is consistent with some of the medical evidence presented prior and subsequent to that determination. However, . . . the claimant's Mental Status examinations were relatively normal during each visitation. These included . . . prior findings for stature, appearance, activity level and posture all within normal limits, average eye contact, "unremarkable" mental status exam, normal mood and affect, normal behavior and thought content, euthymic mood, full affect, logical thought process, . . . clear speech, . . . perception within normal limits, . . . no delusions, no report of response to stimuli or hallucinations observed, no compulsive behavior, no suicidal ideation, no memory loss, no obsessive thoughts, no paranoia or pressured speech, normal insight, no grandiosity, no forgetfulness, no flight of ideas and sufficient fund of knowledge. (Exhibit 7F, 16F, 17F, 21F/4-5). Thus, when considered in light of the entirety of record, Dr. Boen's findings do not create greater limitations of function than those already reflected in the [RFC]. Again, the claimant did not seek formal psychological treatment on a regular basis, nor did she ever require inpatient care for her mental health. In addition, there are only treatment records from the Otis Bowman Center from May 12, 2021, through November 15, 2021, which also substantiates the claimant's lack of formal psychological treatment. It is also noted . . . that the claimant has presented no other medical opinion from a mental health specialist, which would warrant a more stringent [RFC] assessment.

(ECF 9 at 52-53).

The ALJ also considered the opinion of William Shipley, Ph.D., a state agency psychologist who reviewed the record, including Dr. Boen's opinion, in January 2022. (*Id.* at 53; *see also id.* at 247-52, 254-6). Dr. Shipley concluded that Fender could "understand, carry out and remember simple instructions; . . . make judgments commensurate with functions of simple, repetitive tasks; . . . respond appropriately to brief supervision and interactions with coworkers

13

and work situations; . . . [and] deal with changes in a routine work setting." (*Id.* at 255). Dr. Shipley further opined:

> It appears that claimant would be able to manage occasional contact with the public but sustained, intensive, interpersonal contact would be precluded. The claimant would appear to work best alone, in semi-isolation from others or as part of a small group. . . . [T]he claimant seems to be able to maintain at least a minimal relationship with others.

(*Id.*). Like Dr. Boen's opinion, the ALJ found Dr. Shipley's opinion "somewhat persuasive[,]" summarizing the same "unremarkable" mental status examination findings as he did when discussing Dr. Boen's findings. (*Id.* at 53 (citing "7F, 16F, 17F, 21F/4-5")). The ALJ further reasoned with respect to Dr. Shipley's opinion:

> The claimant also had no issues with taking care of her children and household. In addition, the record shows that the claimant was able to provide information about her health, describe her prior work history, follow instructions from healthcare providers, comply with treatment outside of a doctor's office or hospital, respond to questions from medical providers, and there is no mention of any issues with the claimant's short- or long-term memory observed. (Exhibits 9F, 12F, 16F, 21F, and Hearing).

(*Id.* (citations omitted)).[3]

As explained earlier, "the determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." *Thomas*, 745 F.3d at 808 (citation omitted). Here, the ALJ thoroughly considered the opinions of record pertaining to Fender's

---

[3] In her scattershot challenge to the RFC, Fender also argues that the ALJ "fail[ed] to acknowledge" the abnormal examination findings of examiner Kelli Rhodes, N.P., in October 2021. (ECF 23 at 18; *see* ECF 10 at 436-39). Not so. The ALJ penned an entire paragraph on Nurse Rhodes's November 15, 2021, record assessment, noting that Fender presented with a history of anxious and fearful thoughts, depressed mood, difficulty concentrating, excessive worry, fatigue, difficulty sleeping, hallucinations, paranoia, poor judgment, restlessness or thoughts of death or suicide. (ECF 9 at 47; *see* ECF 10 at 436). However, as the ALJ observed, a mental status exam conducted by Nurse Rhodes "was relatively normal[,]" documenting a depressed and anxious mood; constricted affect; logical thought process; normal perception, thought content, and cognition; and denial of hallucinations or delusions, partial insight, and mildly impaired judgment. (ECF 9 at 47; *see* ECF 10 at 437-38). Fender's psychiatric medications were adjusted, and she was instructed to start therapy. (ECF 9 at 47; *see* ECF 10 at 439). And as the ALJ further noted, a mental status exam at the Bowen Center about a month later in November 2021 was "[u]nremarkable[]" which was the "last known visitation in the medical records." (ECF 9 at 51; *see* ECF 11 at 24).

mental health limitations arising from PNES and FND during the relevant time period, and then minimally articulated his reasoning for assigning the weight he did to those medical opinions. *See Misener v. Astrue*, 926 F. Supp. 2d 1016, 1032 (N.D. Ind. Feb. 20, 2013) ("[T]he ALJ need not draw [an accurate and logical] bridge in great detail. He need only 'minimally articulate his reasons for crediting or rejecting evidence of disability." (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992))). Fender's pointing to her diagnoses of PNES or FND, without more, is insufficient to establish that she is disabled or that additional limitations should have been included in her RFC. *See Philpott*, 2014 WL 4244299, at *4.

    4. Pain, Weakness, and Residual Adhesion Issues

Fender also argues that the ALJ failed to address and account for her pain, weakness, fatigue, and "residual adhesions issues" that were "believably affected by [her] surgical history." (ECF 23 at 15). But the ALJ thoroughly considered Fender's complaints of pain and weakness, both during the hearing and to providers, and her surgical history. (*See* ECF 9 at 40, 48-50, 55). The ALJ also considered that an MRI showed lesions on Fender's brain but that they were not classic for any demyelinating disease and were considered related to her drug abuse, requiring no further work up. (*Id.* at 51, 55-58). Significantly, Fender fails to point to any medical opinion that assigned her limitations greater than the ALJ due to her complaints of pain, weakness, fatigue, or "residual adhesions issues" as a consequence of her surgical history. Therefore, Fender's argument based on her surgical history is unavailing.

    5. Mental Complaints

Next, Fender takes aim at an inference made by the ALJ concerning the treatment notes of Michael R. Engle, D.O., Fender's primary care physician. (ECF 23 at 16). The ALJ noted that while Fender relayed mental health complaints, including panic attacks to Dr. Engle in

15

September 2019, Dr. Engle's later notes "do not reflect similar mental health complaints or clinical findings suggesting that there remained uncontrolled and severe symptoms despite treatment." (ECF 9 at 50 (citing ECF 10 at 177-79)). The ALJ further observed that Dr. Engle's notes from May 2020 to June 2021 documented that Fender had an alert demeanor, clear speech and thought, normal memory, a pleasant and even mood, and normal affect and behavior, with the exception of one May 2021 note that indicated a "discouraged" affect. (*Id.* (citing ECF 10 at 151, 159, 161-64, 172, 174)).

Fender counters that Dr. Engle's later notes documented physical symptoms such as constipation (recurrent), fatigue, left hip pain, left foot pain, jaw pain, underweight, diarrhea, back pain, seizure-like activity, lower extremity weakness, and an eye twitch. (*See* ECF 23 at 16 (citing ECF 10 at 151, 154-55, 157, 159, 161-62, 164-65, 167, 172, 174-75, 179)). Fender speculates that these physical symptoms could be "some kind of psychogenic condition affecting her physically but without her full awareness that it is not simply physical—or conversion disorder . . . ." (ECF 23 at 16 (footnote omitted)). Fender's speculation, however, is not supported by Dr. Engle's records, which diagnosed physical conditions such as seizure-like activity (ECF 10 at 151), sinusitis (*id.* at 155), cough (*id.* at 154, 167, 172), diarrhea of infectious origin (*id.* at 155, 167), left hip pain (*id.* at 174), back pain after a "work accident" (*id.* at 157), jaw pain "since tooth extraction" (*id.* at 159), and left foot pain after "crus[]h injury of left foot about 3 weeks ago" (*id.* at 161). "Unsubstantiated claims are of course, no substitute for evidence." *Stewart v. Berryhill*, 731 F. App'x 509, 510 (7th Cir. 2018) (citation and internal quotation marks omitted). Therefore, Fender's assertion that her later physical complaints to Dr. Engle could be rooted in "some kind of psychogenic condition" is wholly unsupported.

### 6. Learning Deficits

Moving on, Fender picks at the ALJ's statement, made in the context of examining the listing for intellectual disorders, Listing 12.05, that "there is no persuasive evidence to support [that Fender] continued to have learning deficits after 2006." (ECF 23 at 16 (quoting ECF 9 at 42)). Fender argues that learning disorders "do not go away" and that this statement contradicts the ALJ's earlier finding at step two that her learning disability in reading, math, and written language was a severe impairment. (*Id.* at 16-17 (citing ECF 9 at 40)).

In reviewing an ALJ's decision, the Court must "give the opinion a commonsensical reading rather than nitpicking at it[.]." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (citation omitted) (stating that the claimant's argument "amounts to nothing more than a dislike of the ALJ's phraseology"). Perhaps the ALJ's phraseology could have been better, but the ALJ made this statement in the context of examining whether Fender met or equaled Listing 12.05 when noting that Fender's last IQ testing occurred in 2006. (*See* ECF 9 at 42 (discussing that Fender's last IQ testing was in 2006 and that it reflected an overall quotient in the low average to average range). Significantly, Fender does not argue that the ALJ incorrectly concluded that she did not meet or equal Listing 12.05. Nor does she produce any evidence indicating that her learning disability warranted greater limitations in the RFC than assigned by the ALJ. *See Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("The claimant bears the burden of submitting medical evidence establishing her impairments and her [RFC]." (citations omitted)). Therefore, Fender's argument that the ALJ failed to account for her learning disability is fruitless.[4]

---

[4] Fender also argues that she had a left-sided weakness and thus could not perform her past relevant work while holding a cane in one hand. (ECF 23 at 22). But the ALJ did not include a limitation in the RFC that Fender use a cane, and Fender does not argue that the ALJ erred in this respect. (*See* ECF 9 at 45). Therefore, this undeveloped argument merits no further attention. *See Crespo v Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments . . . are waived . . . ." (citation omitted)).

In sum, "[the Court's] role is extremely limited. [It is] not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citation omitted). Fender's arguments essentially amount to a request that the Court reweigh the evidence in the hope that it will come out in her favor this time. The Court cannot do so. "In fact, even if reasonable minds could differ concerning whether [Fender] is disabled, [the Court] must nevertheless affirm the ALJ's decision denying her claims if the decision is adequately supported." *Id.* (citation and internal quotation marks omitted). Here, the RFC assigned by the ALJ is supported by substantial evidence and sufficiently explained, and thus, it will not be disturbed.

### E. Step-Four Finding

At step four, the ALJ found that Fender could perform her past work as a glue/press ribbons production assembler (an unskilled, light-exertional job as generally performed) as it was actually performed (sedentary). (ECF 9 at 60). In doing so, the ALJ relied on the VE's testimony that an individual with Fender's RFC could perform her past "work at Tower when she was gluing the ribbons, as performed." (*Id.* at 109-12). Although Fender asserts in the title of her third argument that the ALJ's step-four finding is "unsupported[,]" she fails to actually advance any argument challenging the step-four finding in the text of her argument. (*See* ECF 23 at 22-23). "Such arguments are deemed waived for being perfunctory, undeveloped, and conclusory." *Wetter v. Colvin*, No. 1:12-cv-00364-TAB-RLY, 2013 WL 4790616, at *3 (S.D. Ind. Sept. 9, 2013) (citation omitted). Therefore, Fender's step-four argument warrants no further mention, and the ALJ's step-four finding will not be disturbed.[5]

---

[5] After issuing his step-four finding, the ALJ alternatively found at step five, based on the VE's' testimony, that Fender could perform a significant number of other unskilled sedentary jobs in the national economy, including addresser (2,000 jobs), document preparer (16,000 jobs), tube operator (1,300 jobs), and polisher (1,200 jobs). (ECF 9 at 61; *see id.* at 112-13). Additionally, the ALJ estimated, again based on the VE's testimony, that there were

## IV. CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED. The Clerk is DIRECTED to enter a judgment in favor of the Commissioner and against Fender.

SO ORDERED.

Entered this 18th day of September 2025.

/s/ Andrew L. Teel
Andrew L. Teel
United States Magistrate Judge

---

about 80,000 to 100,000 jobs that an individual with Fender's RFC could perform. (*Id.* at 61; *see id.* at 113). Fender argues that 20,500 jobs is not a significant number of jobs in the national economy. (ECF 23 at 22-23 (citing *James A. v. Saul*, 471 F. Supp. 3d 856, 860 (N.D. Ind. Jan. 27, 2021) (finding 14,500 jobs in the national economy not a significant number))); *see also John C. v. Saul*, No. 4:19-cv-04111-SLD-JEH, 2021 WL 794780, at *5 (C.D. Ill. Mar. 2, 2021) (finding 20,000 jobs in the national economy not a significant number); *Gass v. Kijakazi*, No. 1:19-CV-404-TLS, No. 2021 WL 5446734, at 88 (N.D. Ind. Nov. 22, 2021) (finding 24,000 jobs in the national economy not a significant number). However, there are district court decisions within the Seventh Circuit that have found a similar number of jobs to be significant. *See, e.g.*, *Engel v. Kijakazi*, No. 20 C 1206, 2021 WL 4843871, at *12 (E.D. Wis. Oct. 18, 2021) (finding 23,000 jobs in the national economy a significant number); *Dorothy B. v. Berryhill*, No. 18 CV 50017, 2019 WL 2325998, at *8 (N.D. Ill. May 31, 2019) (finding 17,700 jobs in the national economy a significant number); *see generally Milhem v. Kijakazi*, 52 F.4th 688, 696 (7th Cir. 2022) ("Our circuit's case law does not provide a clear baseline for how many jobs are needed."). Because the ALJ found that Fender could perform her past relevant work at step four and thus was not disabled, the Court need not reach Fender's step-five argument.